**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| THERMOS L.L.C., | |
| Plaintiff, | Case No. 1:23–cv–4495 |
| v. | Hon. Jeffrey I. Cummings |
| SULLY INNOVATIONS INC., | Hon. Gabriel A. Judge Fuentes |
| Defendant. | |

## THERMOS L.L.C.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1

II. THE ASSERTED PATENTS ............................................................................................. 1

III. A PERSON OF ORDINARY SKILL IN THE ART .......................................................... 2

IV. ARGUMENT ...................................................................................................................... 2

    A. Legal Principles Relevant to Utility Patent Claim Construction ..................................... 2

    B. The '269 Utility Patent's Disputed Claim Constructions ................................................. 3

        1. "a button tunnel" .......................................................................................................... 3

        2. "an enclosing structure defining an enclosed channel" ............................................... 6

        3. "mounted" .................................................................................................................... 8

        4. "locking tab" .............................................................................................................. 11

        5. "pivoting engagement" .............................................................................................. 13

        6. "translational movement" .......................................................................................... 15

    C. Legal Principles Relevant to Design Patent Claim Construction ................................... 16

    D. The '060 Design Patent's Disputed Constructions ........................................................ 17

        7. The shape, position, and relative size of the front dimple ......................................... 17

        8. The shape, position, and relative size of the top dimple ........................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Ameranth, Inc.*,
  842 F.3d 1229 (Fed. Cir. 2016) ............................................................................ 7

*Aventis Pharms. Inc. v. Amino Chems. Ltd.*,
  715 F.3d 1363 (Fed Cir 2013) .............................................................................. 6

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858, 863 (Fed. Cir. 2004) ..................................................................... 12

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
  543 F.3d 665 (Fed. Cir. 2008) ........................................................................ 16, 17

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  796 F.3d 1312 (Fed. Cir. 2015) ........................................................................... 18

*Fenner Invs., Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015) ........................................................................... 10

*GE Lighting Sols., LLC v. Agilight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014) ........................................................................... 12

*Grace Instruments, LLC v. Chandler Instruments Co., LLC*,
  57 F.4th 1001 (Fed. Cir. 2023) ............................................................................ 11

*Hill–Rom Servs., Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ............................................................. 5, 10, 12, 13

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
  381 F.3d 1352 (Fed. Cir. 2004) ....................................................................... 4, 14

*IGT v. Bally Gaming Int'l, Inc.*,
  659 F.3d 1109 (Fed. Cir. 2011) ............................................................................. 3

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) ............................................................................. 7

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117 (Fed. Cir. 1993) ...................................................................... 17, 18

*Lifted Ltd., LLC v. Novelty Inc.*,
  No. 16-cv-03135, 2020 WL 2747814 (D. Colo. May 27, 2020) ..................... 21, 22

*Malvern Panalytical Inc. v. TA Instruments-Waters LLC*,
  85 F.4th 1365 (Fed. Cir. 2023) ............................................................................ 10

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009) ........................................................................ 3, 4

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ............................................................................. 6

*Omega Eng'g, Inc, v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ............................................................................. 7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 2, 3, 8, 10

*Pioneer Magnetics, Inc. v. Micro Linear Corp.*,
    330 F.3d 1352 (Fed. Cir. 2003) ................................................................... 7

*Sport Dimension, Inc. v. Coleman Co., Inc.*,
    820 F.3d 1316 (Fed. Cir. 2016) ................................................................. 17

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .......................................................... 2, 3, 4

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ......................................................... 4, 8, 11

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ................................................................... 3

## I.    INTRODUCTION

Thermos L.L.C. ("Thermos") brings this action under a utility patent, U.S. Patent No. 8,550,269 ("the '269 Patent" or "the '269 Utility Patent") and a design patent, U.S. Design Patent No. D675,060 ("the '060 Patent" or "the '060 Design Patent"). Thermos asserts Claim 1 of each patent, which are readily understood by a person of ordinary skill in the art ("POSITA"). The Court should reject Sully Innovations Inc. ("Sully") attempts to rewrite the claims under the guise of claim construction and instead adopt Thermos's positions.

## II.   THE ASSERTED PATENTS

The '269 Utility Patent is titled, "Drink Bottle and Lid with Cover for Drink Spout." Figure 4 of the '269 Patent is reproduced to right. The only claim asserted in this litigation is Claim 1. That claim requires, among other things, (i) a bottle and a removable lid; (ii) the lid including an inner lid and an outer lid; (iii) hinge-related components on the back of the lid to allow the upper lid to pivot relative to the inner lid; (iv) a button mounted in a button tunnel on the front of the inner lid; and (v) a locking tab on the outer lid for engaging with the button when the outer lid is closed. (*See* '269 Patent at Claim 1.)



The '060 Design Patent is titled "Lid for Drink Container." The '060 Patent claims the ornamental design of a lid for a drink container, as shown and described from multiple perspectives in Figures 1–6, reproduced below. (*See* '060 Patent.)



1

## III.  A PERSON OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art at the time of the of the inventions claimed in the '269 Utility Patent and the '060 Design Patent is one with knowledge of mechanics and material properties gained through a bachelor's degree in mechanical engineering, education in a similar discipline, or relevant work experience; and approximately one to two years of designing beverage containers or similar products. (Goldman Decl. ¶ 23.) Sully agrees. (*See* Sully Br. at 5.)[1]

## IV.  ARGUMENT

### A.  Legal Principles Relevant to Utility Patent Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is the claims that define the metes and bounds of the patentee's invention.").

Claims should generally be "'given their ordinary and customary meaning,'" which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. A POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313. As such, a court must consult the intrinsic evidence, including the claims themselves and the rest of the specification. *Id.* at 1314–17. Likewise, the prosecution history may provide evidence of how the inventor understood the patent. *Id.* at 1317.

In some instances, the intrinsic evidence, including the specification and prosecution history, "may reveal a special definition given to a claim term by the patentee that differs from the

---

[1] "Goldman Decl." means the Declaration of Jim Goldman, a declaration providing expert opinions filed with this brief. "Ex." means an exhibit attached to the Declaration of Edgar Matias filed herewith. "JA" refers to the Joint Appendix (D.E. 36). The '269 Patent and '060 Patent are at JA001-20 (D.E. 36–1) and JA549–52 (D.E. 36–3). "Sully Br." means Sully's Opening Claim Construction Brief (D.E. 37).

meaning it would otherwise possess." *Id.* at 1316. In others, the intrinsic evidence "may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* Apart from the intrinsic evidence, extrinsic evidence like dictionaries and expert testimony may "shed useful light" on a meaning, but it is "less reliable than the patent and its prosecution history." *Id.* at 1317–18.

Although claims are read in light of the specification, "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009). Thus, "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Id.* (internal quotation marks omitted). "The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope." *Thorner*, 669 F.3d at 1367.

Claim construction does not require the trial court to simply "repeat or restate every claim term"; it "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Courts should not rewrite otherwise clear claims. *See, e.g.*, *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011)

**B. The '269 Utility Patent's Disputed Claim Constructions**

Thermos responds to Sully's proposed constructions for Claim 1 of the '269 Patent in the same order as presented in Sully's brief, although Thermos responds only to the terms in dispute, and neither party requests construction of "a [first/second] structure that forms part of a hinge."

**1. "a button tunnel"**

| Sully's Proposed Construction | Thermos's Proposed Construction |
|---|---|
| "a structure formed within a portion of the inner lid" | "a structure that surrounds at least a portion of the button" |

3

"A button tunnel" is a simple term that needs construction only to ensure that Federal Circuit law is properly applied. As an initial matter, the "button tunnel" is a structure (i.e., not the empty space defined by a structure), a point on which the parties agree. (*See* Sully Br. at 6.)

The court should "begin a claim construction analysis by considering the language of the claims themselves." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016). Claim 1 uses the term "button tunnel" exactly as one would expect: a structure that generally surrounds the button: "said inner lid defining a ***button tunnel*** . . . said ***button tunnel*** including an enclosing structure . . . a button mounted within said ***button tunnel***." ('269 Patent at Claim 1.)[2]

The Court should read the claims in the context of the broader specification (e.g., the figures and written description proceeding the claims), but it must not read limitations from the embodiments (examples) described in the specification into the claims. *Martek*, 579 F.3d at 1381; *Thorner*, 669 F.3d at 1367. Instead, the Court should review the specification for lexicography (providing an express definition of a term) or disavowal of scope form a claim term. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."). The specification does not provide an express definition or disavowal of "button tunnel." (*See, e.g.,* '269 Patent at 3:59–4:2, 5:4–19.) Instead, the preferred embodiment's description of "button tunnel" is entirely consistent with the plain and ordinary meaning of that term as used in Claim 1— a structure that surrounds part of the button. This is shown in Figure 5, where "tunnel 64" is the button tunnel. (*Id*. at Fig. 5, 5:4–5 ("In the inner lid 20 is formed the tunnel 64 within which is mounted the button 22").)



---

[2] All emphasis added unless otherwise noted.

4

The specification is consistent with the idea that "tunnel" does not mean any structure, but an actual structure that functions as a tunnel (one that surrounds at least a portion of the button):

> The tunnel 64 **encloses** the working parts of the locking mechanism that is operated by the button 22 to protect it from damage and to keep unwanted matter out.

(*Id*. at 3:60–64.) The patent uses plain English. A "tunnel" means "a covered passageway," "subterranean gallery (as in a mine)," or "burrow." (*See* Ex. A at 6.)

The only nuance is that the tunnel need not surround all parts of the button, as this is explicitly disclosed in the specification. For example, the preferred embodiment shows (1) an opening, "slot 62," in the top of the tunnel and (2) an end of the button protrudes out of the tunnel. ('269 Patent at Fig. 5, 3:59–60 ("The slot 62 is formed in a tunnel structure 64 . . . ."); *see also id.* at Fig. 2 (face of button protruding from button tunnel).) Thus, a POSITA reading Claim 1 in the context of the specification would understand the plain meaning of the '269 Patent's "button tunnel" is "a structure that surrounds at least a portion of the button."

Sully's proposed construction is wrong. *First*, it eliminates the concept of a "tunnel" and replaces it with a structure without shape constraints. Sully's construction encompasses structures such as valleys, trenches, receptacles, or other structures that may not require a covered top or otherwise constitute a tunnel. But the patent does not claim a "button valley" or the like; it claims a "button tunnel," thereby requiring the structure to surround at least a portion of the button.

*Second*, Sully's assertion that the button must be "completely surrounded" by the tunnel would violate a bedrock principle of claim construction.[3] "A construction that would exclude the preferred embodiment is rarely, if ever, correct." *See Hill–Rom Servs.*, *Inc. v. Stryker Corp.*, 755 F.3d 1367, 1379 (Fed. Cir. 2014). As noted above, the preferred embodiment's button tunnel does

---

[3] Sully contradicts its own construction. It says that the button must be "completely surrounded" (Sully Br. at 7), yet Sully's construction encompasses wide open structures (e.g., a trench).

not completely surround its button due to slot 62. ('269 Patent at Fig. 5, 3:59–60.) Furthermore,
the preferred embodiment's button tunnel does not completely surround
its button because the face of button 22 protrudes out of the button tunnel.
(*Id*. at Fig. 2, Fig. 6 (showing button protruding); *see also id*. at 3:64–66.)



*Third*, Sully outright ignores the "button" portion of "button tunnel"—the word appears
nowhere in its construction. This is a natural consequence of Sully's attempt to remove the concept
of a surrounding structure, as doing so likewise drops the concept of the material that is surrounded.

Thus, the Court should adopt Thermos's proposed construction and reject Sully's.

### 2. "an enclosing structure defining an enclosed channel"

| Sully's Proposed Construction | Thermos's Proposed Construction |
|---|---|
| "a structure of the button tunnel within which the button is mounted" | No construction necessary |

"An enclosing structure defining an enclosed channel" is a straightforward term with a
plain meaning that is readily understood in the context of the '269 Patent, so the term does not
need to be construed. *See Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed
Cir. 2013); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362
(Fed. Cir. 2008).

Quite simply, there must be a structure—the "enclosing structure"—shaped in such a way
that it defines a channel—the "enclosed channel." ('269 Patent at Claim 1.) Claim 1 goes on to
place other requirements related to the structure and channel, for example that the "sliding arm"
portion of the button is "slidably mounted within said channel within said enclosing structure," but
the term "an enclosing structure defining an enclosed channel" itself only requires a structure that
encloses a channel. (*See id*.)

Sully's construction is totally divorced from the claim language and creates a confused mess.[4,5] In particular, Sully's construction eliminates the entire concept of a channel—the word appears nowhere in Sully's proposed construction. Eliminating a claim limitation through claim construction is improper. *See K-2 Corp. v. Salomon S.A*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

Next, Sully's so-called "estoppel" argument is without merit. Prosecution history estoppel is a doctrine irrelevant to claim construction. It concerns infringement—not claim construction— by estopping a party from using the doctrine of equivalents as the basis for infringement where the equivalent falls within subject matter given up during prosecution of the patent. *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003). To the extent Sully is attempting to assert that Thermos, during prosecution of the '269 Patent, provided a definition of "an enclosing structure defining an enclosed channel" or disclaimed claim scope related to that term, that argument plainly fails. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323–24, (Fed. Cir. 2003) (prosecution disclaimer alters the ordinary meaning of a claim only "where the patentee has unequivocally disavowed a certain meaning to obtain his patent"). Nothing about the amendment quoted by Sully shows that "an enclosing structure defining an enclosed channel" should be construed as Sully requests. The cited amendment does not even include the term "an enclosing structure defining an enclosed channel" (*see* JA337, JA346)—that came in a subsequent amendment (*see* JA259). Regardless, the amendment does not support Sully's claim construction:

---

[4] If Sully's construction were inserted into the claim language, it would incomprehensibly recite: "said button tunnel including <u>a structure of the button tunnel within which the button is mounted</u> . . . said button including a sliding arm slidably mounted within **said channel [?]** within said <u>structure of the button tunnel within which the button is mounted of said inner lid</u> . . . ."

[5] The claim itself already explains the relationship between the button tunnel and the enclosing structure and the relationship between the enclosing structure and the button. ('269 Patent at Claim 1.) Construing claim terms in a way that creates redundancy should be avoided. *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016).

the applicant does not define the term or otherwise disclaim any meaning of that term. (*See* JA337, JA346–347.)[6]

Thus, the Court should decline to construe the straightforward term, "an enclosing structure defining an enclosed channel."

### 3. "mounted"

| Sully's Proposed Construction | Thermos's Proposed Construction |
|---|---|
| "supported by and attached to" | "positioned" |

The term "mounted"—used in various contexts within asserted Claim 1 of '269 Patent—should be construed as "positioned," as this is the plain and ordinary meaning of this term in the context of the claim in view of the intrinsic record generally.

Again, we start with the language of the claim itself. *Trs. of Columbia Univ.*, 811 F.3d at 1362. The asserted claim uses the term "mounted" in several different contexts, and with three different prepositions (within, in, and on), which show that the term "mounted" is consistently used to mean "positioned."

    a. a button ***mounted*** within said button tunnel;
    b. a sliding arm slidably ***mounted*** within said channel;
    c. a drink spout ***mounted*** in said spout opening;
    d. a bail handle ***mounted*** on said outer lid.

(*See* '269 Patent at Claim 1.) Notably, the claimed "channel" is a space, not a structure, so mounted cannot mean "attached" or the like. (*See id.* ("said button tunnel including an enclosing structure defining an enclosed channel to slidably receive a sliding element").) Instead, a POSITA would understand that, in the context of the '269 Patent, the button is *positioned within* the button tunnel,

---

[6] "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

the sliding arm is slidably *positioned within* the channel, the drink spout is *positioned in* the spot opening, and the bail handle is *positioned on* the outer lid. (Goldman Decl. ¶¶ 27–28, 30.)

Furthermore, the claim's use of "mounted" to mean "positioned" is consistent with a plain English use of this term. As Sully's dictionary notes, "mount" means "to put or have in position." (Ex. A at 1; *see also id.* ("to seat or place oneself on"); *id.* at 4 ("to place (an object) on a slide for microscopic examination"); Goldman Decl. ¶¶ 31–32).

Sully's construction, applied to the actual claim language, creates nonsensical results. For example, "a button mounted within said button tunnel" becomes "a button supported by and attached to within said button tunnel." Obviously, "by . . . within" and "to within" make no sense, and Sully's construction should be rejected for this reason alone.

Additionally, Sully's attempt to incorporate "attached" into the claim is unfounded and improper. Of the claim's four usages of "mounted," two use the term in conjunction with an empty space—the channel and opening (items b and c in the list above). It is illogical to say, for example, that the sliding arm is ***attached to*** the channel, as the channel is not a structure but a space. (Goldman Decl. ¶ 28.)

Further, to the extent "attached" may be synonymous with "fastened," "adhered," or similar permanent or semipermanent connection, Sully's construction cannot be correct. For example, Claim 1 requires "a drink spout mounted in said spout opening." ('269 Patent at Claim 1.) In the specification's description of the preferred embodiment, the drink spout is made of a pliable material such as silicone rubber. (*Id.* at 5:31–33.) It is positioned in the spout opening by being squeezed into place and held by pressure against the walls surrounding the opening:



The drink spout 56 extends from the spout base or pedestal 74 which is shaped to fit snugly in the elongated opening 104 of the inner lid 20. The notches 76 provide

a flexing location by which the pedestal is flexed during insertion into the inner lid
20.

(*Id*. at 5:33–37; *see also* Fig. 5, *id*. at 4:30–32 ("The notches 74 permit the spout base 74 to deform

for mounting in the opening of the inner lid 20"); Goldman Decl. ¶ 29.) Because the claim requires

"the drink spout [to be] ***mounted*** in said spout opening," and because the preferred embodiment

achieves this without any permanent or semipermanent attachment, it would be wrong to construe

the claim to require such attachment. *See Hill–Rom Servs.*, 755 F.3d at 1379 ("A construction that

would exclude the preferred embodiment is rarely, if ever, correct.").

Sully's errors flow from violating basic claim construction principles: rather than relying

on the surrounding claim language and other intrinsic evidence, Sully looked to generic dictionary

definitions (crafting, without explanation, its own definition from the ***sixteen*** options provided by

Merriam Webster). "[T]he 'ordinary meaning' of a claim term is its meaning to the ordinary artisan

***after reading the entire patent***." *Phillips*, 415 F.3d at 1321. Sully skips over the intrinsic record

and relies exclusively on extrinsic evidence. (Sully Br. at 8–9.) As a result, Sully analyzes whether

"mounted" has an ordinary meaning in the abstract rather than in the context of the patent, as is

required. *See Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 85 F.4th 1365, 1374–75

(Fed. Cir. 2023) (reversing the district court where its "analysis predominantly addressed whether

[the claim term] has a plain and ordinary meaning broadly in the art," rather than the ordinary

meaning "in the context of the patent"); *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1322–

23 (Fed. Cir. 2015) (explaining that "terms used in patent claims are not construed in the abstract").

This overreliance on generic dictionary definitions leads to erroneous results here. *See Phillips*,

415 F.3d at 1321 (explaining that "heavy reliance on the dictionary divorced from the intrinsic

evidence risks" improperly construing the claim in the abstract rather than in the context of the

patent); *Grace Instruments, LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1010 (Fed.

Cir. 2023) (rejecting reliance on dictionary definitions that did not comport with how a person of ordinary skill would understand the term in the patent's context).

The Court must start from the claim language itself. *See Trs. of Columbia Univ.*, 811 F.3d at 1362. The claim language, like the rest of the specification, shows that the term "mounted" is consistently used to mean "positioned." Recall the four usages in the claim:

    a.   a button ***mounted*** within said button tunnel;
    b.   a sliding arm slidably ***mounted*** within said channel;
    c.   a drink spout ***mounted*** in said spout opening;
    d.   a bail handle ***mounted*** on said outer lid.

The button is positioned within the button tunnel, the sliding arm is slidably positioned within the channel, the drink spout is positioned in the spot opening, and the bail handle is positioned on the outer lid. (*See* '269 Patent at Claim 1.)

Thus, the Court should construe "mounted" as "positioned," its plain and ordinary meaning in the context of the '269 Patent.

### 4. "locking tab"

| Sully's Proposed Construction | Thermos's Proposed Construction |
|---|---|
| "a small strip of material with an opening within the strip of material for latching on to another structure" | No construction necessary |

The "locking tab" term does not require construction, as the element is readily understood in the context of the claim. The claim requires:

a ***locking tab*** extending from said outer lid, said ***locking tab*** engaging said button when said outer lid is in said closed position and said button is in said lock position, said ***locking tab*** being disengaged from said button when said button is moved to said unlock position . . . .

('269 Patent at Claim 1.) The "locking tab" is what it says: a tab for locking. The claim goes on to specify other features required of the tab—that it must extend from the upper lid (e.g., instead of the lower lid) and that it must engage with the button (e.g., instead of some other structure). (*Id*.)

While the preferred embodiment described in the specification may have additional details, the intrinsic record shows no lexicography (providing a definition of "locking tab") or disavowal (asserting that matter is excluded from the plain meaning) necessarily incorporating features of the preferred embodiment into the claim. (*See, e.g.*, *id.* at 3:48–4:2.) So, the plain meaning of "locking tab" is a tab for locking. *See GE Lighting Sols., LLC v. Agilight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal.")

It would be error to add the limitations proposed by Sully, such as "a small strip" and "an opening." Sully reaches its construction by violating key principals of claim construction. Sully does not identify any lexicography in the intrinsic record where the inventor defined "locking tab" to mean "a small strip of material with an opening within the strip of material for latching on to another structure." (*See* Sully Br. at 9–10.) Nor does Sully show that "locking tab" is jargon or otherwise has some special meaning to persons of ordinary skill in the art. (*See id*.) That should be the end of it: "locking tab" is simply a tab for locking, and no construction is necessary.[7]

Instead, Sully commits the cardinal sin of claim construction: taking features from the preferred embodiment and importing them into the claims. *See Hill–Rom*, 755 F.3d at 1371 (improper to "read limitations from the embodiments in the specification in the claims"). Sully tries to use the simple "locking tab" term as a means to add limitations into the claim. While the

---

[7] There is no reason to reword this easily understood term. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004) ("[M]erely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction.").

preferred embodiment's example locking tab has an opening within it, that is no reason to use the claim construction process to read "an opening" into Claim 1. *See id*. The same would be true if the preferred embodiment's locking tab was a "small" "strip" used for "latching" (all terms in Sully's proposed construction), words which do not even appear in the patent's description of a locking tab. *See id*.

Thus, the Court should decline to construe the straightforward term, "locking tab."

### 5. "pivoting engagement"

| Sully's Proposed Construction | Thermos's Proposed Construction |
|---|---|
| "coupling between components wherein relative rotation is permitted between the components" | No construction necessary;<br>Alternatively, "a second hinge portion for <u>pivoting engagement</u> with said first hinge portion to form a hinge" means "a second hinge portion for <u>relative rotation around a common axis</u> with said first hinge portion to form a hinge" |

"Pivoting engagement" does not require construction, as the element is readily understood in the context of Claim 1 to mean engagement that allows a pivoting motion. The claim says this:

> . . . said inner lid including a first hinge portion;
> said outer lid including ***a second hinge portion for <u>pivoting engagement</u> with said first hinge portion to form a hinge so that said outer lid is pivotable relative to said inner lid*** between an open position and a closed position . . . .

('269 Patent at Claim 1.) Also, the specification provides the following:



> The **hinge bearings 130** are disposed on opposite sides of the **uprights 106** engage the **hinge pins 128** to permit ***pivoting movement*** of the lids relative to one another.

(*Id*. at 8:9–11, Fig. 7.)

The hinge uprights 106 are an example of the claimed "first hinge portion" and the hinge bearings 130 are an example of the claimed "second hinge portion." The foregoing intrinsic

evidence shows that "pivoting engagement" of the first and second hinge portions simply means that they are configured to engage in a manner that allows pivoting motion of the lids. There is no lexicography or disavowal in the specification, so there is no need to construe "pivoting engagement."

Sully's construction is incorrect. First, Sully's construction reads "pivot" out of the claim by broadening the claim to capture relative rotational movement by any means, including those lacking pivoting. (Goldman Decl. ¶ 35.) A "pivot" is the axis of rotation around which an object rotates. (*Id*.) Two components become pivotably engaged when the second component can rotate relative to the first about an axis in common with the first component, as in a typical household door hinge. (*Id*. ¶¶ 34–35, 37; '269 Patent at Claim 1, 7:28–37.)

Second, Sully's use of "coupling" is not supported by the intrinsic record: the word does not appear in the '269 Patent, and Sully does not explain what it means by "coupling." (Goldman Decl. ¶ 36.) Sully's construction would confuse rather than assist the jury in deciding infringement.

Third, to the extent the inclusion of "coupling" is an attempt to mandate that the first hinge portion be directly attached to the second hinge portion, Sully yet again errs by reading nonexistent limitations into the claim. That construction should be rejected, as there is no lexicography or disavowal that would support narrowing "engagement." *Home Diagnostics*, 381 F.3d at 1358 ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").

Indeed, requiring direct attachment would be at odds with the preferred embodiment, which shows that the example first and second hinge portions (highlighted in the graphic above) are not directly attached. As noted above, the preferred embodiment's hinge upright 106 and hinge bearing 130 (examples first and second hinge portions) engage with each other through a third component,

14

namely hinge pin 128. ('269 Patent at 7:28–37.) Further at odds with Sully's "coupling" insertion, the specification contemplates that the first and second hinge portions can be designed to disengage to prevent breaking the hinge. (*Id*. at 7:5–17.)

Finally, the use of the word "pivoting" will not cause jurors to misunderstand the scope of the claim. "Pivoting engagement" occurs within the bolded claim limitation in the blockquote above, and jurors will readily understand what it means for the hinge components to engage to form a hinge so that the outer lid is pivotable relative to the inner lid. Thus, the claim uses "pivoting engagement" consistent with its plain meaning of engaging in a manner that allows pivoting motion, and no construction is necessary.

To the extent the court believes jurors would benefit from a rewording, Thermos would not object to this: "a second hinge portion for ***pivoting engagement*** with said first hinge portion to form a hinge" means "a second hinge portion for ***relative rotation around a common axis*** with said first hinge portion to form a hinge." The second portion is pivoting because it is rotating about an axis; it is pivotally engaged with the first portion to form a hinge because that axis is in common with first portion and it is rotating relative to the first hinge portion. (*See* Goldman Decl. ¶¶ 34–35, 37.) This is consistent with how a POSITA would define the term. (*Id*.) This construction aligns with the claim language itself (requiring the components "to form a hinge"), the preferred embodiment (where the hinge uprights 106 define an axis that that the hinge bearing 130 rotate about), and common technical understanding. (*Id*. ¶ 34; '269 Patent at Claim 1, 7:28–37, Fig. 7.)

### 6. "translational movement"

| Sully's Proposed Construction | Thermos's Proposed Construction |
| --- | --- |
| "sliding movement" | "linear movement" |

Asserted Claim 1 of the '269 Patent uses "translational movement" consistent with its standard engineering meaning, and it should be construed for lay jurors accordingly. "Said sliding arm undergoing translational movement" means "said sliding arm undergoing linear movement."

Translational movement can be distinguished from rotational movement about an axis. (Goldman Decl. ¶ 41.) In a translation, an object moves from one point to another in a line; in rotation, the object moves around a fixed point or axis. (*Id*.) In the graphics to the right, the blue drawings show an object initially at rests and the green drawings show the object after movement. That movement is



translational in the left box, and the movement is rotational in the right box. (*Id*. ¶ 42)

There should be no dispute that "translational movement" means "linear movement," as Sully admits this in its brief. It says, "To a person of ordinary skill in the art, translational movement occurs when an object moves uniformly from one position to another in the same line or direction." (Sully Br. at 11–12.) That should be the end of it.

But Sully goes on to incorrectly assert that the moving object must be "sliding." (*Id*. at 12.) An object can undergo translational movement by means other than sliding. Consider a train moving down a track: the passengers are undergoing translational movement (moving in a straight line), but they are not sliding. (*See* Goldman Decl. ¶ 44.) The court should construe "translational movement" as "linear movement." (*Id*. ¶¶ 39–43.)

### C. Legal Principles Relevant to Design Patent Claim Construction

Trial courts have a duty to "conduct claim construction in design patent cases, as in utility patent cases." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc) (citation omitted). However, courts need not "provide a detailed verbal description of the claimed design," because design patents "typically are claimed as shown in drawings." *Id*. (citations

omitted). Design patents are generally better represented by an illustration; accordingly, the "preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Id*. Even so, the Federal Circuit has noted that it may be appropriate to distinguish between functional and non-functional elements of the design. *Id*. at 680. Accordingly, the court may offer a verbal construction to clarify the ornamental (non-functional) aspects of the design without unnecessarily supplanting the visual impression created by the illustrations contained in the design patent. *See id*.

A design is functional when its appearance is "dictated by the use or purpose of the article." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993); *see also Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016). While it may be appropriate to identify the functional features of a design element, it is improper to wholly exclude elements of a simply because they have functional aspects. *Sport Dimension*, 820 F.3d. at 1320. Instead, the Court should consider how the elements of the design patent "contribute to the overall ornamentation of the design." *Id*. at 1323.

### D. The '060 Design Patent's Disputed Constructions

#### 7. The shape, position, and relative size of the front dimple

| Sully's Proposed Construction | Thermos's Proposed Construction |
|---|---|
| the shape, position, and relative size of the front dimple are dictated by function and are therefore excluded from the protected design | the shape, position, and relative size of the front dimple are ornamental and are therefore part of the protected design |

Even if the front dimple and top dimple have some functionality, that functionality does not dictate the dimple's shape, position, or relative size. Thus, their shape, position, and relative size are ornamental and part of the protected design.

17

### a. Functionality does not dictate the use of a front dimple.

Sully contends that that the '060 Patent's front dimple enables a user to use his or her finger to move the handle "from a stowed condition . . . to a deployed condition." (Sully Br. at 15 (quoting '269 Patent at 2:64–67).) The existence of the front dimple—let alone any attribute of the dimple (e.g., shape)—is not dictated by the function of lifting the handle from a stowed position.

"When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." *L.A. Gear, Inc.*, 988 F.2d at 1123; *see also Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1329–30 (Fed. Cir. 2015) ("the availability of alternative designs [is] an important – if not dispositive – factor in evaluating the legal functionality of a claimed design."). Here, the designer could have achieved the functionality of lifting the handle without using any dimple at all. (Goldman Decl. ¶¶ 48–51.)

For example, the designers could have relied on the user inserting a fingernail under the handle. (*Id*. ¶ 50.) Or the designer could have used a flange along part of the handle (a ridge protruding from the handle) to provide a surface for the user to push up. (*Id*.) Or the designer could have relied on an appropriate material (or textured surface) on the handle to allow the user to lift the handle with friction alone. (*Id*.) Indeed, it is not hypothetical that the handle could be lifted with no dimple at all. Consider the product shown to the right that, like the '060 Patent, has a handle integrated into the top edge of the lid. (Ex. B at 5.) There is no dimple, showing that a dimple is not needed in a product with a handle like the handle of the '060 Patent. (*Id*.; Goldman Decl. ¶ 51.)



### b. The front dimple's shape, position, and size are not dictated by functionality.

Even if the function is not *lifting the handle from its stowed position* but instead *providing finger access to the underside of the handle*, the front dimple is at most a mixed element with

functional and ornamental attributes. The front dimple (1) includes a recess adjacent to the bottom of the handle element; (2) is shaped as a single, concave-upward parabola; (3) is positioned on the button's vertical center line; and (4) is sized vertically to be shorter than the button and sized horizontally to be narrower than the button. (*See* '060 Patent at Figs. 1–2.)

This purported function of *providing finger access to the underside of the handle* at most dictates one attribute of the dimple: that it is a recess adjacent to the bottom of the handle element (attribute 1 in the list above). But this function does not dictate the shape, position, or relative size of the dimple (attribute 2–4 above), which are purely ornamental. (*See* Goldman Decl. ¶ 52.) ***Regarding shape***, the function could be achieved with any number of shapes other than a single, concave-up parabola. For example, the function could be achieved with a rectangle or double parabola. (*Id*.) ***Regarding position***, the function could be achieved with positions other than centered above the button. For example, the dimple could be slightly offset to the right or significantly offset to the left. (*Id*.) ***Regarding relative size***, the function could be achieved with any number of sizes other than what is shown in the drawings. For example, the dimple could run the full length of the handle or extend down to (or beyond) the top of the button. (*Id*.)

Indeed, that the claimed design (below left) and an alternate design (below right) both provide finger access to the underside of the handle, notwithstanding the dramatically different shapes, positions, and relative sizes of the dimples (highlighted yellow):



(*Id*. ¶ 53.) The only commonality is a recess adjacent to the bottom of the handle, which is (at most) what is dictated by that function.

### c. Sully's arguments are without merit.

Sully tries to justify its erroneous position with citations to the '269 Utility Patent, which discloses a container lid with the same or similar ornamental design as the lid claimed in the '060 Design Patent. (*Compare* '269 Patent at Fig. 1 *with* '060 Patent at Fig. 1.) But the '269 Patent does not evidence that the front dimple—let alone its shape, position, and relative size—results from a handle-related function (or any other function).

Contrary to Sully's assertion (Sully's Br. at 15), the '269 Patent does not say the dimple "must be" anything. (*See* '269 Patent at 2:64–67, 3:36–41.) It simply acknowledges that the particular dimple of the preferred embodiment ("notch 30") can help the user engage the bail handle to move it from stowed to unstowed, which is fully consistent with numerous other designs (e.g., of different shapes, positions, and sizes) having the same functionality. The patent does not say that the function is achieved by (or causes) the particular shape, position, and size of the dimple of the preferred embodiment. (*See id*.)

Sully's argument relies in part on its assertion that the handle is "***locked*** into the stowed position" and the placement of the dimple at the center of the handle is "necessary" to allow the user to "appl[ly] a counter force . . . sufficient to dislodge the handle from the stowed position." (Sully Br. at 15–16 (citing '269 Patent at 3:36–41).) The '269 Utility Patent never says the handle is "locked" into position, so this characterization is made up by Sully and unfounded. (*See* '269 Patent at 3:36–41.) Sully's purported "lock" is comprised of the two retainer projections 48 on the hidden portion of the handle working in combination with the two retainer indentations 52 on the hidden portion of the lid. (*See id*.; *see also id*. at Fig. 8 (annotated above).) As an initial matter, the '269 Utility Patent does not say that the dimple ***needs*** any particular characteristic (e.g., shape, position, or size) to enable the user to release the handle from its so-called "locked position." (*See id*.) Nor

20

would a POSITA expect that, as these are simple consumer bottles, not precision machinery requiring force optimization. (*See* Goldman Decl. ¶ 54.)

Regardless, Sully's argument is based on plain error. The '060 Design Patent–not the '269 Utility Patent—is at issue in in this construction. The '060 Design Patent does not claim hidden, internal features of the lid, but only the exterior ornamental design. (*See* '060 Patent at Figs. 1–6.) Sully is assuming that the purported "lock" of the '269 Utility Patent must be part of the '060 Design Patent's claimed lid, but this is false. (*See* Goldman Decl. ¶ 54.) Indeed, the '269 Utility Patent says this purported "lock" arrangement is optional. (*See* '269 Patent at 3:41–43 ("other structures for retaining the bail handle in position are contemplated as well").)

The analysis in *Lifted Ltd., LLC v. Novelty Inc.* is applicable here. No. 16–cv–03135, 2020 WL 2747814, at *3 (D. Colo. May 27, 2020). The *Lifted* design patent concerned an ornamental design for a lighter holder, and the defendant—pointing to a related utility patent—identified certain features including an elongated, foldable poker (i.e., used to clear out a pipe), a poker storage slot, and poker access indentation. *See id.* at * 3; *see also* U.S. Design Patent No. D662,655 at Fig. 1 (annotated version shown). The defendant argued that the poker access indentation was functional and should be excluded from the claim because, according to the utility patent, "the indentation was provided to allow the user to pry up on the poker." *Id.* (internal quotation marks removed).



The *Lifted* court rejected defendant's argument because "the fact that the poker and access indentation are designed to serve functional purposes does not mean that the particular design of each element is dictated solely by function." *Id.* The court explained that, although the poker access

21

indentation (and other elements) "serves a functional purpose, they all contain aesthetic features that contribute to the overall design of the smoking tool." *Id*. at *4. The court therefore rejected defendant's attempt to construe the claimed ornamental design in a manner that would exclude the poker access indentation (and other elements) from the claim. *Id*. at *6.

Sully's arguments track the defendant's arguments in *Lifted* and should be rejected for the same reason. Even if the front dimple has a function, that does not mean that its shape, position, and size are dictated by that function. Those attributes are ornamental and part of the claim.

### 8. The shape, position, and relative size of the top dimple

| Sully's Proposed Construction | Thermos's Proposed Construction |
|---|---|
| the shape, position, and relative size of the top dimple are dictated by function and therefore excluded from the protected design | the shape, position, and relative size of the top dimple are ornamental and therefore part of the protected design |

The argument for the top dimple is effectively the same as for the front dimple above. In the interest of brevity Thermos will focus on the key factual points.

### a. Functionality does not dictate the use of a top dimple.

Sully contends that that the '060 Patent's front dimple exists to enable a user to use his or her finger "[to] press to cause the outer lid 24 to engage the inner lid 20 in a locked position." (Sully Br. at 14 (quoting '269 Patent at 2:67–3:1).) The existence of the top dimple—let alone any attribute of the dimple (e.g., its shape)—is not dictated by the function of pushing the outer lid into locked position with the inner lid. The designer could have achieved the functionality of pushing the lids into locked position without using any dimple at all. The top dimple effectively serves as a visual target. (*See* Goldman Decl. ¶ 56.) The designer could have omitted it entirely, and obviously the user would still know to press down on the other lid to close it. (*Id*. ¶¶ 55–57.) Or the designer could have used a flange along part of the handle (a ridge protruding from the handle)

to provide a surface for the user to push down. (*Id*. ¶ 60.) Or the designer could have relied on a protrusion on the side of the outer lid to provide a surface for the user to push down. (*Id*.)

Indeed, it is not hypothetical that the handle could be lifted with no dimple at all. (*Id*. ¶¶ 58–59.) U.S. Design Patent No. D739,183 shows a different lid design than the '060 Patent, but which also has a hinged upper lid and lower lid. (Ex. D at Figs. 1, 7.) Obviously, there is no top dimple, showing that a dimple is not needed in a product with a lid structure like the '060 Patent. (*Id*.) The same is true of the real-word product shown previously. (Ex. B at 6.)

### b. The top dimple's shape, position, and size are not dictated by functionality.

Even if the function is not *pushing the outer lid into locked position with the inner lid* but instead *providing a push target to accommodate a finger*, the top dimple is at most is a mixed element with functional and ornamental attributes. The top dimple (1) includes a recess on the top surface of the outer lid; (2) is shaped as a single oval with its long axis in the left-right direction; (3) is positioned on the top surface of the lid such that it is centered in the left-right direction and about halfway between the front and center of the lid in the front-back direction; and (4) is sized larger than the front dimple and smaller than the button. (*See* '060 Patent at Figs. 1, 5.)

This function of *providing a push target to accommodate a finger* at most dictates one attribute of the dimple: that it is a recess on the top surface of the outer lid (attribute 1 in the list above). But this function does not dictate the shape, position, or relative size of the dimple (attribute 2–4 above), which are purely ornamental. (*See* Goldman Decl. ¶ 61.)

***Regarding shape***, the function could be achieved with any number of shapes other than a single, left-right oval. For example, the function could be achieved with a rectangle, circle, half circle, or double oval. (*Id*.) ***Regarding position***, the function could be achieved with any number

of other positions . For example, the dimple could be placed on the handle or at the lid's center. (*Id*.) ***Regarding relative size***, the function could be achieved with any number of sizes other than what is shown in the drawings. For example, the dimple could run the full width of the lid or extend to (or beyond) the lid's center. (*Id*.) Indeed, the claimed design (below left) and an alternate design (below right) both provide a push target to accommodate a finger, despite their dramatically different visual impressions:

 

(*Id*. ¶ 62.) The only commonality is a recess on the top surface of the lid, which is (at most) what is dictated by that function.

### c. Sully's arguments are without merit.

Sully tries to justify its erroneous position with citations to the '269 Utility Patent, but the '269 Patent does not show that the top dimple—let alone its shape, position, and relative size—results from a function related to pushing with a finger (or any other function). Sully again mischaracterizes the teachings of the '269 Utility Patent. (*See* Sully Br. at 14–15.) The '269 Patent ***does not*** say the dimple is in the "exact location" that a user "should" press or that, if it where elsewhere, "pressure would not be transmitted" to close the lid. (*See* '269 Patent at 2:67–3:2, 4:52–56.) Instead, the '269 Utility Patent says, "a depression 32 is formed on the top of the outer lid 24 on which **the user <u>may</u> press** to cause the outer lid 24 to engage the inner lid 20 in a locked condition." (*Id*. at 2:67–3:2.) And, while the utility patent notes that a push in this location should apply a force to close the lid, it does not state that this is the ***only*** location where the user can push to achieve that result. (*Id*. at 4:52–56.)

Sully's argument relies in part on its assertion that the placement of "depression 32" is related to location of certain components internal to the lid, namely flange 70 and gusset 86 to flex the drink spout 56. (Sully Br. at 14–15.) But the '060 Design Patent does not claim hidden, internal features of the lid, but just the exterior ornamental design. (*See* '060 Patent at Figs. 1–6.) Sully is assuming that the flange 70, gusset 86, to flex the drink spout 56 of the '269 Utility Patent must be part of the '060 Design Patent's claimed lid, but the '060 Design Patent would cover bottles with the claimed exterior ornamentation and that, internally, had a totally different drinking apparatus than the drink spout shown in the '269 Utility Patent. (*Id.*) This is not hypothetical, and such bottles exist in the real world. (*See* Goldman Decl. ¶ 63; Ex. C.)

As already discussed above, Sully's position is like the one rejected in *Lifted*. The court explained. Just because elements "serve a functional purpose," they can also "contain aesthetic features that contribute to the overall design of the [product]." 2020 WL 2747814 at *4.

Thus, even if the top dimple has a function, that does not mean that its shape, position, and size are dictated by that function. Those attributes are ornamental and part of the claimed design.

Dated: May 3, 2024                                   Respectfully Submitted,

                                                     /s/ Louis A. Klapp
                                                     Louis A. Klapp
                                                     Edgar Matias
                                                     RILEY SAFER HOLMES & CANCILA LLP
                                                     70 West Madison Street, Suite 2900
                                                     Chicago, Illinois 60602
                                                     Telephone: (312) 471-8700
                                                     Fax: (312) 471-8701
                                                     lklapp@rshc-law.com
                                                     ematias@ rshc-law.com

                                                     *Attorneys for Plaintiff Thermos L.L.C.*